Judge Napton
delivered the opinion of the -court.
The principal question in this case is, whether the lien of -the judgment obtained by Relf & Chew in 1819, was enforced by the execution which issued upon the judgment of the supreme court in 1823 -affirming the former judgment. -
The’law relating to the manner of executing the judgments of appellate courts in Missouri, has not been materially changed since the act of Oct. 1,1804, under the first grade of territorial government. The fourth section of that act provided, that “on all writs of -error, it shall be lawful for the general court to issue execution or remit the cause to the •inferior-court, in order that on execution may be there issued, or that, ■other proceedings may be had thereupon.” By-the act of July 3, 1807, .provision was made for appeals from the ’common pleas to the general •court, and it was declared the duty of the general court, where an appeal was duly entered to examine the record and award a new trial, reverse or affirm the judgment of the court below, or give such judgment as the court below ought to have given. It is further declared, that “the general court may order the record aforesaid with their decision and determination thereon written and duly -certified, to be remitted to the said inferior court, on payment of the fees incurred in the said general court, •and the same decision and determination shall be duly carried into exe *608 cution by such inferior court, or the general court,may award execution to carry into effect its decision and determination.”
When the State government went into operation, and the supreme court superceded the general court, the act of Dec. 12, 1S20, enacted that “When any cause may be finally determined and judgment rendered, or decree pronounced therein, the record thereof, with the decision thereon written, may be certified and remitted to the appropriate court, there to be carried into execution and effect, or the supreme court may proceed to carry the s ame into effect by execution or other proper process, issued into any county within this State.” The act of Jan. 11, 1822, is more explicit. “In all cases of appeals or writs of error decided by the supreme court, the said court may order the record in the cause, with their decision and determination thereon written and duly certified, to be transmitted to the proper circuit court, on payment of the costs incurred in the supreme court, and such decision and determina, tion shall be duly carried into execution by such circuit court, or the supreme court may award execution to carry said decision and determination into effect.” The law as it stands now, and has stood in the versions of 1825 and 1835, is substantially the same. “The supreme court, upon the determination of any cause on appeal or error, may award execution to carry the same into effect, or may remit the record, with their decision thereon, to the circuit court from whence the cause came, and and such determination shall be carried into execution by the circuit court.”
If the construction of these statutes were now an open question, unaffected by a long continued practice under them, there would be strong grounds for contending that the judgment of the supreme court was intended to be the only judgment which could be executed, after a supersedeas on error or appeal; that this judgment, when it was in affirmance of the judgment of the inferior court, should be not only a judgment of affirmance, but a formal judgment of recovery for the damages or debt and costs embraced by the affirmed judgment, and also for the costs' of the supreme court. Upon this construction, the execution, whether issued from the clerk’s office of the supreme or circuit court, •would issue upon the judgment of the supreme court. The question would then arise whether such execution would enforce the lien of the judgment of the inferior court. In such case, it would be obvious that if the execution upon the judgment of the appellate court would not enforce the lien of the affirmed judgment; the lien was destroyed by the supersedeas. It could be enforced in no other way, the judgment of the *609 inferior court being merged certainly for all purposes except the lienj in the judgment of the appellate court.
Our statutes have, however, received a different construction in practice. Judgments of affirmance have been merely such in form, without any additional judgment quod, recuperet. A certified copy of the record of this judgment, transmitted to the inferior court, has been understood to remove the suspensión of the judgment of the inferior court, occasioned by the supersedeas, and to give authority for the issuance of an execution upon the judgment affirmed. An execution issues from the supreme court for the costs of that court. The practical construction df the statute hás been to limit executions upon the judgments of the supreme court to cases wliere a new judgment of recovery is entered in this court, and in cases of affirmance to let the execution go from the circuit court upon the judgment of that court.
Under these circumstances, this court would hardly feel itself at liberty to give a construction to these acts variant froin the received usage of the court, and the general understanding of the bar for a period of nearly thirty years. The propriety of the practice may well be doubted, but I confess myself unwilling to hazard an opinion in opposition to a practice so long acquiesced in by those concerned in the administration of the law. That the practice of the clerks has occasionally varied, is seen by the facts of the present, and the case of Evans vs. Wilder (5 Mo. Rep. 322) yet in these cases the form of the judgment is the same. The judgments are simply of affirmance, and not judgments of recovery. The form of a judgment of affirmance in the supreme court of New York, like that in the court of King’s bench contains a judgment of recovery for the damages, or debt and damages of the judgment of the inferior court, as well as a judgment of affirmance. The judginent of affirmance might be construed as embracing substantially a judgment for the recovery of the debt and damages of the affirmed judgment, if the statute were construed to authorize an execution only upon the judgment of the supreme court. Such a construction, indeed, must necessarily be given to it, upon this view of the law, or it must go for nothing, and remain forever unexecuted. But if we -adopt the construction which has been practically in vogue from the commencement of our State government, and consider that the judgment of affirmance merely removes the supersedeas from the affirmed judgment, and permits the execution to go upon the latter judgment, the necessity for construing the judgment of the supreme court as embracing in substance a judgment of recovery, is removed. Indeed, it *610 would be difficult to reconcile the practice under the law with the idea that the judgment of affirmance, as it is usually entered, is a substantive and independent judgment of recovery. If it were so, it must follow that the judgment of the inferior court, upon which it is based, could no longer be executed, except through the medium of the judgment into which it has merged. It is clear to my mind, upon any construction of our statutes that it was not designed that there should be two judgments of recovery in force at the same time, either of which could be executed at the option of the party in whose favor the judgments were rendered. The practice, therefore, of executing the judgment of the circuit court, after an affirmance by the supreme court, is based upon the idea that the judgment of the supreme court in cases of affirmance, is not a distinct and independent judgment of recovery, which may be enforced by execution, but merely a determination on the part of that court that the judgment of the circuit court is right, and that it should therefore remain in full force, and that the party holding it should no longer be restrained from enforcing it by execution. No doubt, if it were desirable, the supreme court might enter a judgment of recovery, at the same time that a judgment of affirmance is given, and if it did so, at the suggestion of parties, or upon its own convictions of propriety.
I should think that, under our statute, no execution could then issue upon the judgment of the circuit court, although an execution might issue upon the judgment of the supreme court, either from the clerk’s office of that court, or of the circuit court. It being the duty of the circuit court to carry into effect the determination of the supreme court, the execution, in such a case, whether it is issued by the circuit court or supreme court, must issue upon the judgment of the supreme court. Such has been the uniform practice in all cases where judgments of recovery have been entered in the supreme court. The judgment of the inferior court is first reversed, unless it be designed to superadd a judgment of recovery to a judgment of affirmance, (which in practice has never prevailed) and a judgment for debt and damages is then awarded, and upon such judgment an execution may issue from the supreme court, or upon the certified transcript of such judgment, the circuit court may issue execution. The execution, however, in all such cases, must issue upon the judgment of the supreme court. No question can arise about the lien of the judgment of the inferior court, for that judgment having been reversed, and a new judgment entered in the appellate court, the execution can of course only enforce the lien of the latter judgment.
*611 The lien of the first judgment is necessarily lost by its reversal. Hence, I apprehend, it has happened, that no application has been made to the supreme court, in cases of affirmance, for the additional judgment in that court of recovery-—-it being ■ greatly more advantageous to the party having the judgment below, to be permitted to enforce it, and in that way to enforce its lien.
From this view of the statutes, and the practice under them, I conclude that a judgment of affirmance by the supreme court has been understood to be a judgment that the circuit court proceed to execute its own judgment, which is pronounced to be valid and according to law and in full force. This determination or decision of the supreme court being duly certified to the circuit court, is carried into effect by an execution upon the judgment so declared to be affirmed. Where the appellate court designs to carry into effect its own judgment, and that judgment is in accordance with the previous judgment of the inferior court, a judgment of recovery must be superadded to the judgment of affirmance and an execution from the supreme court or from the circuit court, may enforce this judgment.
We do not wish to be understood as deciding, that the execution which issued upon the judgment of the supreme court in 1823, in favor of Relf and Chew, was void.. That question arose in the case of Evans vs. Wilder, and the court was then of opinion that the judgment was good, at least for costs, and- seemed inclined to sustain a title acquired under the execution, although it was intimated that such an execution would be set aside upon a direct application for that purpose.- We shall not disturb that decision. Admitting the execution in favor of Relf and Chew to be valid, it would not enforce the lien of the judgment of the circuit court rendered in 1819.
In 1807, judgments of the court of common pleas were declared liens throughout the county, and judgments of the general court throughout the territory,, both liens continuing for five years. In 1815 the court of common pleas was abolished, and its duties divided between the circuit courts and county courts. This was the state of the law in 1819, when the judgment in favor of Relf and Chew against Hammond was rendered. In. 1820 the St.ate government went into operation, and judgments of the supreme court, and the superior court of chancery were declared liens throughout the districts in which they were rendered. In 1822 the duration of their liens were limited to three years.
In the case of Planters’ bank vs. Calvet{3 Smedes and Marshall 192) the question was distinctly presented, whether an execution upon a *612 judgment of affirmance by the supreme court will enforce the lien of the. affirmed judgment. Under the statutes of Mississippi, the execution; issued upon the judgment of the supreme court, although it issued from the clerk’s office of the inferior court. Hence it is apparent, that if the lien of the judgment of the inferior court was not enforced through the. medium of the judgment of affirmance, the result must have been that the supersedeas destroyed the lien. To sustain the lien under these circumstances, it was necessary to hold, that for. this purpose alone, the judgment of the inferior court was not merged or extinguished by the judgment of affirmance, although to every other intent it clearly was. The supersedeas rendered it impossible that anexecution could ever after issue upon the supersedeas judgment. Whatever disposition might be made of the judgment, the judgment of the court to whose revision it was submitted, was alone to be executed. The court, however, which decided this case, arrived at the conclusion that the lien still existed, although it would not be enforced directly by any proceeding upon the judgment from which it sprung. It wás enforced indirectly through the judgment of the, supreme court. We are not under the necessity of determining this, question. Although one cannot but admire the ingenuity and learning which the judge, who delivered the opinion of the supreme court of' Mississippi, brought to-bear upon the, question, it is difficult to reconcile some of his positions with general principles. To maintain the lien of a judgment, which can never be enforced, except through the medium, of a second judgment, ■ which second judgment had also a lien of its own, would seem to be inconsistent with the nature of a lien. No such difficulties present themselves here, in sustaining the continuance of the lien after a supersedeas, since the judgment which creates it may be directly enforced upon its affirmance by the appellate court. There is no necessity for enforcing it through an execution upon another judgment. Under our statutes in 1823, the lien of the judgment of the supreme court extended throughout the district, whilst that of a circuit court judgment was confined to the county. The lien in both instances was limited to five years. In Mississippi, there was no limit to the duration of the lien, and it does not appear that the liens of the two judgments-were in any respects different. The, construction which we have given to our statutes will avoid all conflict between the liens of the severál courts, and render it unnecessary to tack one lien to another. The lien of the judgment of the circuit court will be lost whenever there is a new judgment of recovery given by the supreme court, and when the *613 judgment of the supreme court is simply one of affirmance, the execution of the judgment of the circuit court will of course enforce the lien of that judgment. In Mississippi, the party could not enforce his affirmed judgment except b.y an execution upon the judgment of the supreme court which affirpied it. 'Rhere was a manifest injustice in holding the lien of the judgment to be lost by the supersedeas, where the legislature had not expressly declared that it should be, and the conclusion to which the supreme court of Mississippi arrived, in permitting the lien to be enforced indirectly by an execution upon the judgment of the supreme court, was no doubt in conformity to the true intent of the legislature. But inasmuch as under our statute the lien may be directly enforced, the spirit and object of our legislative enactments on this subject may be carried out without resorting to the forced construction to which the Mississippi court was driven.
As the plaintiff’s title will not reach further back than May 1823, when the judgment was rendered under which they • purchased, it becomes material to. examine the defendant’s title under the mortgage to Wash. The deed was dated May 1, 1821; was acknowledged by Mrs. Hammond on the 8th June, 1821, before a justice of the county court of Jefferson county, and recorded in St. Louis on the 23d day of August 1821. This deed was a deed to Robert Wash as trustee for the benefit of the bank of Edwardsville, and empowered Wash to sell the land in the event of the non-payment of the above $200,, which Hammond had borrowed from the bank, and which the deed was given to secure. The objection to this deed is, that it was not properly acknowledged, so as to authorize it to be recorded.
The act of Oct. 1, 1804 provided, that all deeds, affecting lands, should be acknowledged by one of the grantors, or proved by one or more of the subscribing witnesses, before one of the judges of the general court, or before one of the justices of the court of common pleas of the district where, the land conveyed lies, and should be recorded within twelve months. The act of Feb. 1, 1817, provided, that title bonds, and other written instruments, touehing a mere equitable interest in land, sRould also be acknowledged and recorded. Three months, instead of twelve, was the period limited by this law for recording. Justices of the peace were also by this law authorised to take the acknowledgment of deeds, and all previous acts repugnant to its provisions were repealed. No change was made in the mode of acknowledging deeds. The act of Oct, 1, 1804, was therefore the only *614 law prescribing the mode of acknowledging deeds, atthetime the deed; to-Wash was acknowledged.,
Whilst the only object of recording conveyances was to give notice to-, subsequent purchasers and mortgagees,, it is clear, that this purpose could he attained by recording the deed upon the acknowledgment of one of the grantors, as well as-upon the acknowledgment of all, where there was more than one grantor. It was no part of the original purpose of our recording acts, which were borrowed from the registry laws of England, to facilitate the proof of the execution of deeds, upon their introduction as evidence in court. It was not until 1825, that the acknowledgment of a conveyance, in the mode prescribed by statute, was. allowed to dispense with any further proofs of its execution. As th.e law stood in 1821, when the deed from Hammond and wife to Wash was executed, it was permitted to be recorded upon the acknowledgment of one of the grantors, and the record merely imported notice to subsequent purchasers and mortgagees. Had the deed been offered in evidence before the passage of the act of 1825, concerning conveyances, its execution must have been proved in the same way as though it had. never bepn recorded. But the act of 1825, whilst it permits for the first time conveyances acknowledged according to law to be read in evidence without further proof, also provides, for their acknowledgment by all the grantors, as a pre-requisite to their being recorded. This change from the act of 1804 was rendered, necessary by the additional object proposed to be accomplished. The onfy object of the first act was to give notice of the deed, whilst the act of 1825 not only aims to effect this, hut also to facilitate the introduction of deeds in evidence, and therefore- its provisions are adapted to both purposes.
If Mrs. Hammond was one of the grantors in the deed to Wash, then an acknowledgment of the deed by her was. sufficient, under the law in 1821,, to authorise it to he placed upon, record. The counsel for the plaintiff in error insists, that she was not—that the husb.and a-nd wife together constitute hut one party to a conveyance. It is very true, that for many purposes, the husband and wife are considered in law as one, and under our statutes, the wife cannot convey, any interest in real estate without joining,her husband in the conveyance. If the act of 1804 had made the record of a deed prima facia evidence of its execution, the argument in favor of holding the husband and wife as constituting but one grantor under the act, would be strong, if not conclusive, The wife’s acknowledgment would be a nullity, unless the husband had also executed the deed, and if the record is to prove execution of the deed, *615 it would seem necessary that an acknowledgment by the party whose •execution of the deed the record was designed to establish, should be pre-requisite to an authority to record. But as the act has no such object, and merely makes the record notice, there is no motive for •giving the act such a construction. The notice is effected just as Well .by the record upon the wife’s acknowledgment, as though the husband had acknowledged it. The execution of the deed by the husband must •be proved aliunde. Without such proof, it can be of no avail for any •purpose, and with such proof, the record upon the sole acknowledgment of the wife, comes within the intent and letter of the act of 1809. No •question has been made in this case, in relation to the execution of this -deed by Hammond, or in relation to the proper mode of proving 'such execution. The record leaves us to assume that the proof on this-head was satisfactory.
It is supposed, however, that the title under Wash fails, on account -of the invalidity of the decree obtained in 1834, in favor of Mason as ¡the assignee of the bank of Edwardsville the cestiue que trust in the deed of Hammond. The objection to the decree is, that the purchasers 'from Hammond, subsequent to the execution of the mortgage 'or deed of trust, were not made parties to the suit, and the case of Watson and others vs. Spencer (20 Wend. 260) is cited as authority, In that case, the plaintiffs were the purchasers of the equity of redemption, both by deed and under executions. The mortgage had, before the mortgagee brought his bill for foreclosures, sold to one of the plaintiffs, and the other, Watson, had bought under an execution. The bill was brought against the mortgagor alone, and the court held that the decree of fore•closure, and the sale in pursuance thereof, did not affect the plaintiffs, who had purchased from the mortgagor, and who were-not made parties to the bill in equity, and that the purchaser, under the decree, although in possession, was amere stranger, and could not protect himself against the owner of the equity of redemption, by setting up an outstanding .title in the mortgagee. This last proposition is obviously based upon a construction of a mortgage peculiar to the State of New York. The courts of that State hold, that the freehold is in the mortgagors, and that the mortgagee has but a chattel interest. 2 Cow. 19; 11 J. R. 584. The mortgagee, before foreclosure, cannot maintain ejectment against the mortgagor ; (1-8 Wend. 485) but the mortgagor, after forfeiture, is still treated as the real owner, and may maintain ejectment against any •one, except perhaps the mortgagee. This doctrine results from a statutory provision of that State, and is certainly not the law lien as to the *616 other branch of the decision, that the purchasers from the mortgagor must be made parties to the bill seeking a foreclosure, it may be observed, that this court in the case of the heirs of Mullanphy vs. Russell (4 Mo. R. 319) has decided otherwise. In relation to the propriety 6f this decision, it is unnecessary to venture any opinion: The statute n'ow clearly and expressly requires subsequent incumbrancers to Be notified.
Admitting the decree to be void, how can the plaintiffs ffecover upon th'e received construction of mortgages in this State, with áñ'outstanding title in Wash. It is said, indeed, that a presumption of satisfaction will arise from lapse of timé, and this may be true as a general proposition ; but how can such a presumption be indulged in here with the record of this chancery proceeding staring us in the face. If the decree be á valid one, the title of the purchaser under it is valid, and if the decree be a nullity, the mortgage or deed of trust remains unsatisfied. The presumption which might arise from lapse of time is rebutted. The record is certainly conclusive to show that a proceeding was had to foreclose the mortgage, and the nullity of the proceeding must show that the foreclosure was not effected, and that the deed remains in full force, with the legal title in the trustee or mortgagee.
The other judges concurring, the judgment is reversed.